**Exhibit E**

Rob Bonta
Attorney General of California
Daniel A. Olivas, SBN 130405
Ed Ochoa, SBN 144842
Senior Assistant Attorneys General
Deborah M. Smith, SBN 208960
Supervising Deputy Attorney General
Katherine Schoon, SBN 344195
Leena Sheet, SBN 235415
Deputy Attorneys General
600 West Broadway, Suite 1800
San Diego, CA 90013-1230
Telephone: (619) 321-5809
Fax: (916) 731-2129
Email: Katherine.Schoon@doj.ca.gov
*Attorneys for the People of the State of California*

[EXEMPT FROM FILING FEES PURSUANT TO GOV. CODE, § 6103]

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SACRAMENTO

| | |
|---|---|
| **PEOPLE OF THE STATE OF CALIFORNIA EX REL. ROB BONTA, ATTORNEY GENERAL,**<br><br>*Petitioner*,<br><br>v.<br><br>**THE AMERICAN CHEMISTRY COUNCIL. Inc.,**<br><br>*Respondent.* | Case No.<br><br>**PETITION TO ENFORCE INVESTIGATIVE SUBPOENA**<br><br>**[Gov. Code, § 11180 et seq.]** |

///

///

///

///

///

///

1

Petitioner People of the State of California, Ex Rel. Rob Bonta, Attorney General, by and through the undersigned, allege as follows:

**PARTIES**

1.      Petitioner Rob Bonta is the Attorney General of the State of California. He brings this action solely in his official capacity on behalf of the People of the State of California.

2.      Respondent, American Chemistry Council, ("ACC") is a trade association that represents the interests of American chemical companies, including petrochemical companies responsible for creating plastic products. ACC is headquartered in the District of Columbia. Founded in 1872 under the name Manufacturing Chemists Association, it later became the Chemical Manufacturers' Association, and now it is referred to as ACC. ACC states its mission is to promote the interests of the chemical industry.

3.      ACC members include businesses of various sizes involved in the creation and sale of chemical products, many of which operate within the State of California. However, ACC is predominantly funded by major chemical companies, as dues are determined by the number of chemical products manufactured or sold in the Unites States.

4.      ACC lists member companies located in a majority of the counties of California, including: Imperial, San Diego, Los Angeles, Riverside, Los Angeles, Orange, San Bernardino, Kern County, Ventura County, Santa Barbara, San Luis Obispo, Tulare, Kings, Fresno, Madera, Merced, Monterey, Santa Clara, Contra Costa, San Joaquin, Sacramento, El Dorado, Sonoma, Yolo, Shasta, and others.

5.      ACC leadership has for decades included major petrochemical company members such as Exxon Mobil Corporation (ExxonMobil).

6.      ACC has promoted its members' priorities with elected officials, including legislators and legislation at issue in California.

7.      ACC has spent millions of dollars in lobbying efforts in the State of California, including attempting to prevent adoption of plastic bag bans and to prevent bans on other chemicals such as bisphenol A, among other legislation.

8.      ACC has paid for advertisements specifically targeted to Californians regarding recycling.

**BACKGROUND**

**I.      THE PLASTICS POLLUTION CRISIS**

9.      The rapidly increasing production of single-use plastic products has long overwhelmed the world's ability to manage the resulting waste. Every year, millions of tons of plastic enter the oceans.

10.      Despite this growing crisis, the plastics industry continues to rapidly expand single-use plastic, recently investing an additional $208 billion to expand plastic production worldwide.

11.      Plastic pollution is pervasive in California, polluting the state's rivers, beaches, bays, and ocean waters, including national marine sanctuaries and state marine protected areas, and costing the state an estimated half a billion dollars each year in clean up and prevention. Plastic waste also harms California wildlife. Plastic-related wildlife fatalities were documented as early as the 1970s.

12.      Plastic pollution is harmful to human health and the environment. Both the production of plastic and plastic recycling, among other processes in the plastic life cycle, create harmful greenhouse gases and airborne toxics that create inhalation risk for humans and animals.

13.      Once plastic waste enters the environment as pollution, it is long-lived, and can have substantial negative impacts on a wide range of species. Exposed to the elements, plastics leaked into the environment inevitably disintegrate into smaller and smaller pieces until they eventually become "microplastics," tiny plastic bits measuring 5 millimeters or less that are readily transported by air, wind, water, and the fecal matter of organisms that ingest them.

14.      Humans have been ingesting plastics due to plastic's invasion of our food chain. Microplastics are found in numerous foods including fish and seafood that humans consume.

15.      Plastic is being ingested and absorbed by humans to such an extent that it is found in our tissues. Scientific studies support that molecules of plastic have been found in placentas and humans with carotid plaque. Several known toxic chemicals are often constituents of plastic,

1    such as Bisphenol A (BPA) and per- and polyfluoroalkyl substances (PFAS), which have well

2    documented toxic effects on humans.

3    **II.    THE PLASTICS INDUSTRY'S DECEPTIVE RECYCLING CAMPAIGN**

4    16.    In the 1980s, in the wake of images of overflowing plastic at landfills and

5    widespread plastic litter, state and local governments considered bills restricting or banning

6    plastic products. In response, the plastics industry began an aggressive—and deceptive—

7    marketing and advertising campaign to convince the public that it could recycle its way out of the

8    plastic waste and pollution problem.

9    17.    ACC, in conjunction with the Plastics Industry Association (PLASTICS), formerly

10   Society of Plastics Industry (SPI), created a variety of front groups that promoted recycling as a

11   solution to the plastic waste and pollution problem, all the while knowing that mechanical

12   recycling would never and will never be able to process more than a tiny fraction of the plastic

13   waste that the plastics industry produces.

14   18.    These front groups, funded mainly by major petrochemical companies like

15   ExxonMobil, function as a *de facto* marketing division creating misleading advertising and media

16   campaigns that continue to portray recycling as the solution to the single-use plastic waste crisis.

17   19.    Recent reporting has revealed that the plastics industry has long known the truth

18   about plastics recycling. In 2020, reporting by National Public Radio and Frontline revealed

19   internal documents as early as the 1970s showing that plastics industry executives were warned

20   that plastics recycling was "infeasible" and that there was "serious doubt" that plastics recycling

21   "can ever be made viable on an economic basis."

22   20.    Despite the plastics industry's decades' long recycling campaign, the U.S. plastic

23   recycling rate has never surpassed nine percent, even when a massive amount of U.S. plastic

24   waste was exported to China under the pretense of recycling. Today, the U.S. recycling rate has

25   slipped even lower, with a current rate of just five percent, according to the U.S. Department of

26   Energy. The remaining 95 percent is landfilled, incinerated, or otherwise released into the

27   environment.

28

4

21.     The plastics industry's deceptive recycling campaign continues today but with a modern twist: In addition to supporting mechanical recycling, the plastics industry is aggressively promoting and advertising "advanced recycling," also known as "chemical recycling."

22.     Chemical recycling is the term used to describe a variety of processes that use heat, pressure, catalysis, or solvents to turn plastic waste into monomers, polymers, or in the case of pyrolysis, into intermediate pyrolysis oil (naphtha) that can be further processed in a steam cracker to produce fuels, lubricants, and olefin feedstocks to make new plastics. There are few chemical recycling plants in operation in the U.S. or world today. Most chemical recycling projects in the U.S. use pyrolysis technology, which is a heat-based process that is most commonly used to convert plastic waste into fuels, not new plastic.

23.     Studies have shown that chemical recycling (just like mechanical recycling) is not an economically viable solution to the plastic waste and pollution crisis. The current U.S. operating capacity for all chemical recycling plants is less than 0.5 percent of the plastic waste generated in the U.S. every year. Recent reporting has revealed that several high-profile chemical recycling projects funded by large petrochemical companies that began in 2018 and 2019 have since shut down or remain indefinitely stalled.

24.     Studies have also shown that the same problems that have plagued traditional recycling—sorting and cleaning highly contaminated plastic waste and creating end products that can compete on price and quality with virgin plastics—also prevents chemical recycling from scaling up to meaningfully address the 44 million metric tons/year[1] of plastic waste generated in the U.S.

25.     Nevertheless, the plastics industry continues to promote chemical recycling as the "new and improved" solution to the plastics pollution crisis, despite the fact that the pyrolysis technology has been in existence since as least the 1950s and attempts to use heat-based processes to recover plastic waste streams began at least as early as the 1970s.

---

[1] A metric ton is the equivalent of a tonne, as commonly used in relevant studies.

5

26.     ACC, in particular, touts advanced recycling as a solution to plastic waste issues, making specific false statements in advertisements about advanced recycling that emerging evidence shows to be false.

27.     Specifically, ACC is lobbying to change the definition of recycling to include advanced recycling, under the guise that this chemical process is somehow akin to mechanical recycling, despite the stark differences and the serious flaws in process.

28.     ACC submitted the results of an ACC funded study, coined the "Environmental Claims Study" (Study), to the Federal Trade Commission (FTC), in an attempt to modify the existing definition of recycled content and other definitions relevant to their campaign to support the expansion of chemical recycling.

29.     The FTC regulates the marketing of environmental claims, and provides guidance to companies who seek to market their products with specific green claims, such as recyclable, compostable, or made from recycled content.

30.     ACC purportedly engaged an "independent, nationally representative survey" of 3,007 Americans concerning recycling questions, and arrived at the conclusions that:

- **88% of Americans consider advanced recycling to be recycling.**

- **RECYCLED CONTENT:** 85% of consumers believe if a new plastic product is made from plastics processed through advanced recycling, the product could have a label saying it contained "recycled content."

31.     ACC relied exclusively on this Study in the formation of its public comments to modify the Federal Trade Commission (FTC) Green Guides.

32.     A closer look at the Study and its results reveals that the questions asked were leading and misleading.

33.     For example, the ACC states that the Study finds that "only 1% of respondents thought the term [recyclable] meant 'likely to be recycled' based on access to a recycling facility, as it is currently defined in the Guides." In other words, the ACC is attempting to establish—through the Study—that consumers do not care whether plastic items are actually recycled; rather, they only care if they could hypothetically be recycled.

34.     This conclusion was drawn from the question: "If you were to see product packaging labeled as "recyclable," what would that tell you about the packaging in the context of being environmentally responsible? What would the word recyclable mean to you in that context?"

35.     The 35 options/responses listed were confusing and overlapping. For instance, 36% of those surveyed mentioned the word "recycle," of which 21% believed recyclable meant "recyclable, able to recycle, can be recycled." ACC failed to mention that 31% of those surveyed stated they thought recyclable meant "reusable/able to reuse/can be reused/can be used again." Representing the Study to say that only 1% of the survey thinks that recyclable means "likely to be recycled" is misleading when 31% of those surveyed believed the item was going to be re-used and an additional 21% believed it was going to be "recyclable, able to recycle, can be recycled."

36.     The Study further describes "advanced recycling" in terms misrepresenting the actual process and capabilities used currently in advanced recycling techniques. The Study asks, "The [first/next] approach includes separating plastics from other waste and sorting into different types. While some plastics can simply be cleaned, ground down into reusable bits and reused, this approach focuses on plastics that would be **harder to process and don't fit into traditional recycling**. Using advanced recycling technologies, **plastics are broken all the way down into their basic building blocks so they can be used again to make a variety of high-quality products, including new plastics. This process replaces use of virgin plastics (using natural gas or crude oil) that would have been needed to make the new products.** [Emphasis Added] Do you believe this approach is an example of recycling or not?" Not surprisingly, phrased in this way, advanced recycling was overwhelmingly believed to be recycling. However, this Study does not depict advanced recycling as it actually operates with significant production of fuel from steam cracking of pyrolysis oil.

37.     The ACC also states in its press release for the Study that "[a]dvanced recycling technologies help provide needed recycling solutions for diverse **hard-to-recycle plastics** packaging and material entering the recycling stream, including **film and flexibles, multi-layered pouches, tubes, and other mixed plastics**." [Emphasis added.]

38.     Upon information and belief, advanced recycling suffers from many flaws including that it cannot and is not processing difficult to recycle plastic products as advertised. A significant majority of the small amount of waste plastic, most often what is described as "pre-consumer" films, that is used in the "advanced recycling" process is either lost in the process or converted to fuel, wax or lubricants – notably, not to a new plastic product.

39.     Importantly, most if not all of the plastic produced at the end of the production cycle is going to be comprised of virgin (new) plastic rather than recycled plastic.

40.     Advanced recycling creates other environmental consequences and dangers such as toxic air pollution and fire hazards.

41.     ACC's assertion that the "process replaces the use of virgin plastics" is false.

42.     For manufacturers, the benefit of advanced recycling is not environmental sustainability, it is profit. The companies employing "advanced recycling" sell their product claiming it is made from recycled content marketed as "certified circular polymers," when the products are in fact created almost entirely from new virgin polymers. The manufacturers then sell essentially their same new virgin plastic product at an inflated price, while maintaining (and expanding) virgin plastics sales, leading consumers to believe they are recycling when instead they are being misled to consume ever-increasing amounts of single-use plastics.

43.     The Attorney General seeks to understand why ACC describes advanced recycling in the way it does, who the members are that provided ACC with that definition or data, and what data that description was based on. The Attorney General's investigation seeks to determine if the information being promulgated is truthful, and if ACC or its members knew or should have known that it was falsely describing advanced recycling. Given the wording of the Study, it appears it was constructed in a way to reach specific conclusions, therefore the conversations leading up to the issuance of the Study would help explain what was being discussed and why the questions presented were chosen and whether the Study was truly independent.

44.     ACC claims the Study was based on an "independent" survey, but the ACC's responsive privilege log (discussed in more detail below) shows that at least 550+ written conversations or correspondence of unknown length took place within the ACC and with its

members concerning this Study. The sheer amount of correspondence concerning the Study diminishes the credibility of the claim that it was conducted independently.

45.     The Attorney General does not seek to infringe on ACC's lawful speech pursuant to the First Amendment, but the Attorney General need not merely stand by as the plastics industry and ACC – jointly and in concert – intentionally and knowingly make untruthful and fraudulent statements to the public, the government, and the legislature in order to increase their profits.

46.     ACC put the Study into issue when it submitted the Study and "data" to the FTC. Although the ACC is legally entitled to petition the FTC for changes in the Green Guides, the law does not protect ACC's provision of false facts and data to the FTC. This potentially unlawful and fraudulent speech is the speech to which the Attorney General is seeking access, which is not protected by the First Amendment.

## JURISDICTION AND VENUE

47.     Jurisdiction and venue are proper in the Superior Court of the State of California in the City and County of Sacramento under Government Code section 11186. Moreover, the documents at issue are designated to be produced in Sacramento therefore venue is proper pursuant to Government Code section 11187.

## THE ATTORNEY GENERAL'S INVESTIGATIVE AUTHORITY

48.     The Attorney General is the head of the Department of Justice, and therefore has the authority to issue subpoenas pursuant to Government Code section 11181, and to delegate that power pursuant to Government Code section 11182.

49.     Specifically, Government Code sections 11180 et seq. grants the Attorney General, as head of the Department of Justice, the authority to issue subpoenas. (See Gov. Code, § 11181, subds. (e), (f).) The Attorney General may use these powers for various reasons, including assisting him in considering possible prosecutorial actions, proposing legislation, and formulating enforcement policies with other agencies. (Gov. Code, §11180; *Younger v. Jensen* (1980) 26 Cal.3d 397, 404–406.)

50.     These investigative powers are not dependent on the initiation of a civil lawsuit or

9

an administrative proceeding. (*Brovelli v. Super. Ct. of L.A. County* (1961) 56 Cal.2d 524, 529 [quoting *United States v. Morton Salt Co.* (1950) 338 U.S. 632, 642–43].) The Attorney General has broad discretion and may investigate based on suspicion that the law is being violated or to determine that it is not. (*Ibid.*) If a party disobeys a subpoena, the Attorney General may petition the Superior Court for enforcement. (Gov. Code, § 11187.)

**THE ATTORNEY GENERAL'S INVESTIGATION AND INVESTIGATIVE SUBPOENA**

51.     On or before April 28, 2022, Attorney General Rob Bonta acted pursuant to Government Code section 11182 to delegate his authority to investigate the petrochemical industry regarding its efforts to deceive the public regarding the plastic pollution crisis and to issue subpoenas, inspect books and records, and administer oaths in connection with that investigation. The Attorney General delegated that authority to, among others, Deputy Attorney General (DAG) Nina Lincoff.

52.     On December 6, 2023, DAG Lincoff issued an investigative subpoena to ACC pursuant to Government Code section 11181 and the above-described delegation of authority, directing ACC to produce certain documents at the Attorney General's Office in Sacramento. True and correct copies of the Subpoena and declaration of service are attached hereto as Exhibit A, and are incorporated into this petition. The Subpoena provided notice of the time and place for the production of papers. (Gov. Code, § 11187, subd. (b)(1).) The subpoena provided ACC thirty days to respond.

**DOCUMENTS BEING SOUGHT**

53.     The Attorney General's Subpoena consists of two (2) narrowly-tailored requests, seeking documents or communications concerning the funding, proposal, planning, execution and follow-up to the Study.

**ACC HAS FAILED TO ADEQUATELY AND SUBSTANTIVELY RESPOND**

54.     On January 19, 2024, Petitioner received "THE AMERICAN CHEMISTRY COUNCIL'S RESPONSES AND OBJECTIONS TO INVESTIGATIVE SUBPOENA TO PRODUCE DOCUMENTS," hereinafter referred to as "Response #1."

55.     Response #1 included broad boilerplate objections asserting that the Request is

10

overbroad and not proportional to the needs of this investigation insofar as it seeks "all documents and communications," and calls for documents which are the production of "confidential or proprietary information" and/or "privileged communications subject to the associational privilege."

56.     Response #1 contained 56 pages of documents consisting of Zoom meeting invitations, and publicly available information: e.g., an ACC Press Release surrounding ACC's comments to the FTC Green Guides Questions, ACC's submission to the FTC's request for public comments on changes to the Green Guides, and the "final" 28-page memo ACC received from Heart & Mind Strategies titled "Subject: Evidence of Public Perceptions and Labeling Preferences relating to 'Recycled Content' and 'Recyclable' claims," also submitted to the FTC.

57.     With Response #1 was a cover letter, providing a list of search terms used.

58.     On February 2, 2024, ACC provided a second production bates stamped 57-127, purportedly derived from the same search terms, which included a few emails from reporters, duplicates of the FTC submissions, publicly available articles, and an ACC member newsletter entitled "news recap."

59.     On March 15, 2024, ACC provided a third and final production consisting of bates stamped documents 128-194, including one email between ACC and a reporter and duplicates of the same FTC submissions previously submitted. In total, ACC provided 31 documents including many duplicates. Other than the emails with third party reporters, most if not all of the documents were publicly available information. TACC did not turn over a single document concerning the funding of the Study, nor was there a single document of substance concerning the planning, execution or follow-up of the Study.

60.     On March 15, 2024, ACC provided a 50-page privilege log, in which ACC lists approximately 550 documents (of unknown length) withheld from production in response to the Subpoena based on "associational, petitioning and free speech privileges of the United States and California Constitutions." The privilege log describes the documents as either "confidential communication resulting from communications with member" or "confidential communication with member."

61.     All 550 log entries include the same date "range" from January 1, 2021 to December 6, 2023. Although the identity of ACC employees is indicated, the names and or emails of the "members" involved are not included and instead are listed as "[redacted member representative(s)]."

62.     In sum, the privilege log gives no hint as to what the documents concern, or why the privilege would apply to these documents, other than that they involved conversations with members. The logs do not even provide context as to what time period they were issued, and instead list a common range of dates. The logs do not indicate how many members' rights are potentially at issue, nor was an affidavit provided to show that revelation of the content of the member names or other content would chill their speech.

63.     On May 26, 2024, Petitioner sent a demand letter (Demand Letter) to ACC requesting a revised privilege log and seeking access to the documents listed as privileged, based on a detailed review of current case law concerning claims of associational privilege.

64.     The Demand Letter sought a response within 14 days, on or before May 17, 2024.

65.     Having received no response to the Demand Letter from ACC, the Petitioner followed-up with ACC on May 13, 2024, contacting ACC via telephone and email.

66.     On May 14, 2024, ACC responded seeking to set a meet and confer date for May 16, 2024.

67.     On May 16, 2024, the Petitioner met with ACC to discuss the terms of the Demand Letter. ACC offered little to no information about their defense. ACC requested additional time to discuss the possibility of providing a more thorough privilege log with their client. The Petitioner sought to set another meet and confer date, which was scheduled for May 22, 2024.

68.     On May 22, 2024, ACC and the Petitioner met via Zoom, however the meeting was not productive. ACC had no new additional information to provide and only sought additional time to consult with its client's members to discuss the chilling effect of the Subpoena on its members. An additional meet and confer date was set for the following week.

69.     On May 23, 2024, ACC abruptly sent the Petitioner a formal response to its

Demand Letter, for the first time providing any substantial legal argument and case law in support of its position that the privilege log provided was adequate and that the documents being sought were protected under the First Amendment.

70.     Shortly after sending its response, ACC cancelled the invite to the meet and confer session scheduled for the following week with no explanation or corollary correspondence.

71.     ACC has made no evident good faith attempt to meet and confer regarding the details of its legal position.

72.     Instead, one day later, on Friday, May 24, 2024, ACC filed (simultaneously with related trade association PLASTICS) a claim for declaratory and injunctive relief in the United States District Court for the District of Columbia under case number 1:24-cv-01533, alleging violations of ACC's rights under the First and Fourteenth Amendments of the United States Constitution and under Article I of the California Constitution; right to assemble under Article I, Section 3 of the California Constitution; and Violation of Plaintiff's rights under the First, Fourth and Fourteenth Amendment of the United States Constitution all based on the AG's requests for a more detailed privilege log, evidence of a prima facie case of associational privilege, and/or access to documents asserted as privileged.

73.     The suit filed demonstrates that ACC had no intention of making a good faith effort to meet and confer, and, instead, the requests for extensions served only to entice the Petitioner into providing additional delays so that ACC could craft a legally unjustified lawsuit in the District of Columbia in an attempt to thwart the authority of the Courts in the state of California.

## THE COURT'S AUTHORITY TO ORDER COMPLIANCE WITH THE SUBPOENA

74.     Government Code section 11187 provides that if a witness has failed to produce materials called for by an investigative subpoena, the head of the department issuing the subpoena may petition the Superior Court for an order compelling compliance. That section further provides that a proceeding, such as this one, brought by the Attorney General or other appropriate official, shall be the sole vehicle for determining the validity of any objections to the subpoena.

1

## **PRAYER FOR RELIEF**

2      Wherefore, pursuant to Government Code sections 11186 through 11188, Petitioner prays

3  that this Court issue an order directing ACC to appear before this Court at the earliest time as is

4  suitable to this Court and then and there to show cause why it has failed and refused to comply

5  with the Attorney General's subpoena, and on ACC's failure to show cause, enter an order

6  directing ACC to produce all subpoenaed documents at a time and place fixed by the order.

7

8

9

10

11  Dated: May 28, 2024                                    Respectfully submitted,

12                                                          ROB BONTA
                                                            Attorney General of California
13                                                          DEBORAH M. SMITH
                                                            Supervising Deputy Attorney General
14                                                          LIZ RUMSEY
                                                            Deputy Attorney General
15

16                                                          *Katherine Schoon*

17

18                                                          KATHERINE SCHOON
                                                            Deputy Attorney General
19

20

21

22

23

24

25

26

27

28

PETITION TO ENFORCE INVESTIGATIVE SUBPOENA

# EXHIBIT A

1
2
3
4
5
6
7
8

Rob Bonta
Attorney General of California
Daniel A. Olivas, SBN 130405
Senior Assistant Attorney General
Deborah M. Smith, SBN 208960
Supervising Deputy Attorney General
Justin J. Lee, SBN 307148
Nina Lincoff, SBN 348936
Deputy Attorneys General
 1515 Clay Street, 20th Floor
 Oakland, CA 94612
 Telephone:  (510) 879-1017
 Fax:  (510) 622-2121
 Email:  Nina.Lincoff@doj.ca.gov
*Attorneys for the People of the State of California*

9

10

11

12

13

BEFORE THE DEPARTMENT OF JUSTICE

OFFICE OF THE ATTORNEY GENERAL

STATE OF CALIFORNIA

14
15
16
17

| | |
|---|---|
| **In the Matter of the Investigation of:**<br><br>**The Plastics Industry** | **INVESTIGATIVE SUBPOENA FOR RECORDS AND DOCUMENTS**<br><br>**(Cal. Gov. Code, § 11180 et seq.)** |

18

19

**TO:**        **AMERICAN CHEMISTRY COUNCIL**

20

21

22

**David L. Anderson**
**Sidley Austin LLP**
**555 California Street, Suite 2000**
**San Francisco, CA 94104**
**dlanderson@sidley.com**

23

24

25

26

**NOTICE:**   (  )   You are served as an individual.

(  )   You are served as (or on behalf of) the person doing business under the fictitious name of _____.

(X)   You are served on behalf of:  **AMERICAN CHEMISTRY COUNCIL**

27

28

1

INVESTIGATIVE SUBPOENA FOR RECORDS AND DOCUMENTS

Pursuant to the powers conferred by California Government Code section 11180 et seq. upon the Attorney General of California, as head of the Department of Justice, which powers the Attorney General has delegated to Senior Assistant Attorney General Daniel A. Olivas, Supervising Deputy Attorney General Deborah M. Smith, and Deputy Attorneys General Justin J. Lee and Nina Lincoff, and any other attorney assigned to this investigation:

**AMERICAN CHEMISTRY COUNCIL, a non-profit trade association for the chemicals industry, IS HEREBY COMMANDED** to produce the DOCUMENTS, papers, books, records, and other items described below in YOUR custody, possession, or control, or the custody, possession, or control of YOUR subsidiaries, affiliates, parents, predecessors, successors, employees, partners, officers, agents, or representatives within thirty (30) days of service hereof.  These DOCUMENTS shall be delivered to the California Department of Justice, Office of the Attorney General, 1300 I Street, Suite 125, Sacramento, CA 95814, ATTN: DEBORAH SMITH, SUPERVISING DEPUTY ATTORNEY GENERAL.

YOU may seek the advice of an attorney in any matter connected with this subpoena. YOU should consult YOUR attorney promptly so that any problems concerning YOUR production of DOCUMENTS may be resolved within the time required by this subpoena.

**FAILURE TO COMPLY WITH THE COMMANDS OF THIS SUBPOENA WILL SUBJECT YOU TO THE PROCEEDINGS AND PENALTIES PROVIDED BY LAW.**

**DEFINITIONS**

Definitions for industry or trade terms contained herein are to be construed broadly. Where the industry or trade definition set forth herein does not coincide precisely with YOUR definition, the DOCUMENT request should be responded to by using the definition which YOU apply and/or recognize in your usage of the term, and YOU must document YOUR definition in the response.

1. "AMERICAN CHEMISTRY COUNCIL" means the non-profit trade association for the chemicals industry, with the address 700 Second Street, NE, Washington, DC 20002 including subordinate or affiliated organizational units of any kind, such as parents, divisions,

2

affiliates, partnerships, subsidiaries, predecessors including all present and former officers, directors, employees, agents, consultants, attorneys, representatives or other persons acting on behalf of the foregoing.

2.      "COMMUNICATION" or "COMMUNICATIONS" means any act, action, oral speech, written correspondence, contact, expression of words, thoughts, or ideas, or transmission or exchange of data or other information with or to another PERSON, whether written or oral, by telephone, letter, personal delivery, intercom, telex, fax, email, text message, voicemail, voice message, compact or floppy disc, or any other process or medium.  Any such COMMUNICATION in writing shall include without limitation any printed, typed, handwritten, or other readable DOCUMENTS RELATED TO the COMMUNICATION.

3.      "DOCUMENT" or "DOCUMENTS" means any papers, books, accounts, documents, and writings as defined in Evidence Code section 250, whether in hard copy or electronically stored.  Electronically stored DOCUMENTS include, but are not limited to, current and archived emails, attachments, text messages, instant messages, and any form of electronic messaging.  Sources of electronically stored DOCUMENTS include, but are not limited to:

(i) Desktop personal computers ("PCs") and workstations; PCs, workstations, minicomputers, and mainframes used as file servers, application servers, or mail servers; laptops, notebooks, and other portable computers, whether assigned to individuals or in pools of computers available for shared use; home computers used for work-related purposes; and cellular telephones used for work-related purposes.

(ii) Backup disks and tapes, archive disks and tapes, and other forms of offline storage, whether stored onsite with the computer used to generate them, stored offsite in another company facility, or stored offsite by a third-party, such as, without limitation, in a disaster recovery center.

(iii) Computers, telephones used for work purposes, and offline storage media used by agents, vendors, consultants, sales personnel, representatives, and other

3

INVESTIGATIVE SUBPOENA FOR RECORDS AND DOCUMENTS

PEOPLE acting for or on behalf of YOU, including, without limitation, PEOPLE who are not YOUR employees or who do not work on YOUR premises.

4.     The "ENVIRONMENTAL CLAIMS SURVEY" means the survey conducted from January 30, 2023 through February 8, 2023, and all associated work product and COMMUNICATIONS, by the AMERICAN CHEMISTRY COUNCIL and Heart+Mind Strategies, as referenced in YOUR April 20, 2023 press release titled, "Advanced Recycling is Recycling, 88% of Americans Say in Survey" published on YOUR website at https://www.americanchemistry.com/chemistry-in-america/news-trends/press-release/2023/advanced-recycling-is-recycling-88-of-americans-say-in-survey.

5.     "MARKET," "MARKETED," or "MARKETING" means to advertise, publish, promote, persuade, or educate, including through product studies or trials, conferences, speeches, presentations, meetings, direct mail, recordings, public relations, email, videos, websites, television, newspapers, magazines, and/or social media including, but not limited to, Twitter, YouTube, Facebook, and Instagram.

6.     "PERSON" or "PEOPLE" means any natural person, individual, business entity (whether partnership, corporation, limited liability company or corporation, trust estate, or incorporated or unincorporated association), governmental agency or entity, and any other legal or commercial entity however organized.

7.     "RELATE TO," "RELATING TO," or "RELATED TO" means about, alluding to, analyzing, concerning, commenting on, connected to, constituting, discussing, describing, directing, documenting, evidencing, governing, mentioning, pertaining to, referencing, referring to, reflecting, regarding, responding to, showing, or stating.

8.     "YOU" and "YOUR" refers to the AMERICAN CHEMISTRY COUNCIL, as defined above.

9.     As used herein, "including" means "including but not limited to."

10.     As used herein, the terms "and" and "or" shall be construed to include and as well as or.  The terms shall be interpreted conjunctively and shall not be interpreted to exclude any information otherwise within the scope of the request.

## **INSTRUCTIONS**

### **DO NOT DESTROY ANY DOCUMENTS RELATING TO OR REQUESTED IN ANY OF THESE DOCUMENT REQUESTS**

1.     Unless specified otherwise, the applicable time period for each DOCUMENT request is from January 1, 2021, until the date YOUR full responses to these DOCUMENT requests are due.  Any DOCUMENTS RELATING TO this period are to be produced, regardless of whether the DOCUMENTS came into existence before, after, or during this period.

2.     Each DOCUMENT produced pursuant to this subpoena should be identified according to the particular numbered request to which it is responsive.  In lieu of indicating on each DOCUMENT the request to which it is responsive, YOU may provide an index of all DOCUMENTS YOU produce, as long as this index shows the appropriate numbered request to which each DOCUMENT or group of DOCUMENTS is responsive.

3.     As used herein, the past tense includes the present and future tenses, the present tense includes the past and future tenses, and the future tense includes the past and present tenses; tenses must be construed in the manner that would include, rather than exclude, information.  In addition, the use of the singular form of a word includes the plural, and vice-versa.

4.     Unless otherwise specified, original DOCUMENTS must be produced.  If YOUR "original" is a photocopy, then the photocopy would be and should be produced as the original.  Each such photocopy shall be legible and bound or stapled in the same manner as the original.

5.     This subpoena calls for the production of all responsive DOCUMENTS and information in YOUR possession, custody, or control, regardless of whether such DOCUMENTS or information is possessed directly by YOU or by YOUR directors, officers, agents, employees, representatives, subsidiaries, managing agents, affiliates, and investigators, or by YOUR attorneys or their agents, employees, representatives, or investigators.

INVESTIGATIVE SUBPOENA FOR RECORDS AND DOCUMENTS

6.    DOCUMENTS not otherwise responsive to this subpoena shall be produced if such DOCUMENTS RELATE TO DOCUMENTS that are requested by this subpoena, or if such DOCUMENTS are attached to DOCUMENTS requested by the subpoena and constitute enclosures, attachments, addenda, exhibits, routing slips, transmittal memoranda, letters, comments, evaluations, or similar materials.

7.    If any responsive DOCUMENT or information cannot be produced in full, YOU are to produce it to the extent possible, state or otherwise indicate which DOCUMENT or information or portion thereof is being withheld, and state each and every reason that DOCUMENT or information or portion thereof is being withheld.

8.    If YOU do not possess, control, or have custody of any DOCUMENT responsive to any request set forth below, state this fact by so specifying in YOUR response to said request, and identify any PERSON in whose possession YOU believe the DOCUMENT to be.

9.    If a DOCUMENT once existed but has been lost or destroyed or is missing or cannot be found, provide information sufficient to identify the DOCUMENT, state the details RELATED TO its loss or destruction, and provide any DOCUMENTS RELATED TO its loss or destruction.

10.    If any DOCUMENT responsive to a request is withheld from production for any reason, state the following with respect to each such DOCUMENT:

       (i) The title of the DOCUMENT;

       (ii) The name of the author of the DOCUMENT;

       (iii) The DOCUMENT'S date of preparation;

       (iv) The subject matter of the DOCUMENT;

       (v) The name of the custodian of the original of the DOCUMENT and the name of the custodian of any copies of the DOCUMENT; and

       (vi) Each and every reason why YOU have withheld the DOCUMENT from production.

INVESTIGATIVE SUBPOENA FOR RECORDS AND DOCUMENTS

11.      To the extent responsive DOCUMENTS, COMMUNICATIONS, or other things exist in an electronic format, please contact the officer issuing this subpoena to discuss the manner and format in which the DOCUMENTS, COMMUNICATIONS, or other things are to be produced to facilitate the production of full and complete copies in a usable format.  In the absence of a separate agreement regarding the manner and format of production, the following instructions shall apply to electronically stored information:

(i) The information shall be provided on CD/DVD or external hard drive formatted as follows:

a. Native files shall be converted to Bates numbered single page tiff (black and white) or jpg (color) files;

b. Multipage text files shall be named based on the associated Bates number containing extracted or OCR text;

c. Image load files shall be in Opticon or Ipro format;

d. Relativity data files shall include all metadata fields including Sha-1 hash value and attachment range for compound documents;

e. Any Excel document or native document that includes formulas shall be in a native file format;

f. Any audio files shall be in a WAV file format; and

g. Any video files shall be in an AVI file format.

(ii) The response should include all DOCUMENTS and computer programs necessary for the accurate conversion, analysis, and review of the electronic record, information, and data, including but not limited to operating instructions, manuals, user guides, keys, legends, and codes for systems, programs, files, and data fields.

12.      In the event obtaining electronic DOCUMENTS in an effective manner will require our access to electronic hardware in YOUR possession, custody, or control, we request

INVESTIGATIVE SUBPOENA FOR RECORDS AND DOCUMENTS

that YOU notify us at least ten (10) days prior to the date set for production, to develop a plan for the production and copying of electronic DOCUMENTS.

13. If YOU or YOUR counsel assert that any DOCUMENT or other item requested herein is privileged or otherwise protected, in whole or in part, YOU must create and submit a privilege log that sets forth the following information:

(i) The place, approximate date, and manner of recording, creating, or otherwise preparing the DOCUMENT, COMMUNICATION, or other thing;

(ii) A description of the type of DOCUMENT, COMMUNICATION, or other thing, including its subject matter;

(iii) The name and organizational position, if any, of each sender, recipient, custodian, or person participating in the preparation or creation;

(iv) A detailed explanation setting forth the factual and legal basis for YOUR claim that the DOCUMENT, COMMUNICATION, or other thing is privileged or otherwise immune from production; and

(v) Information that identifies each PERSON claiming that any information or response requested herein is privileged or otherwise protected.

14. At the date, time, and location for production of the requested DOCUMENTS, COMMUNICATIONS, and other things, YOU must provide a declaration from YOUR custodian of records that complies with California Evidence Code sections 1560, 1561, 1562, and 1271.

15. YOUR written answers to these DOCUMENT requests must be signed, dated, and verified by the person providing the answers.

## **DOCUMENTS TO BE PRODUCED**

1. All DOCUMENTS and COMMUNICATIONS RELATED TO the ENVIRONMENTAL CLAIMS STUDY, including, but not limited to, the proposal, planning, execution, and follow-up regarding the ENVIRONMENTAL CLAIMS STUDY.

2. All DOCUMENTS and COMMUNICATIONS RELATED TO the funding of the ENVIRONMENTAL CLAIMS STUDY.

INVESTIGATIVE SUBPOENA FOR RECORDS AND DOCUMENTS

## DECLARATION OF NINA LINCOFF

I, Nina Lincoff, declare as follows:

1.      I am a Deputy Attorney General of the State of California.

2.      The Attorney General of California, pursuant to California Government Code section 11180, has authorized an investigation of possible violations relating to business practices and subjects under the jurisdiction of the California Department of Justice.

3.      I have been delegated authority by the Attorney General to conduct said investigation and hold hearings connected to the investigation pursuant to California Government Code section 11182.

4.      The Attorney General's Office has received information that the AMERICAN CHEMISTRY COUNCIL'S promotion and marketing of recycling plastic may have resulted in legal violations.  These violations include potential common law and statutory violations, such as products liability, public nuisance, and violations of the California Unfair Competition Law (Bus. & Prof. Code, §§ 17200 et seq.), California False Advertising Law (Bus. & Prof. Code, §§ 17500 et seq.), and other laws regarding environmental protection, public health, and consumer protection.

5.      The facts set forth herein are personally known to me, and I have first-hand knowledge of the same.  If called as a witness, I could and would competently testify thereto under oath.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated this 6th day of December, 2023 in Oakland, California.


*Nina Lincoff*
Nina Lincoff

9

INVESTIGATIVE SUBPOENA FOR RECORDS AND DOCUMENTS

## <u>DECLARATION OF SERVICE BY E-MAIL</u>

Case Name:    In the Matter of the Investigation of the Plastics Industry

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter

On <u>December 6, 2023</u>, I served the attached **INVESTIGATIVE SUBPOENA FOR RECORDS AND DOCUMENTS** by transmitting a true copy via electronic mail, addressed as follows:


David L. Anderson
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
**E-mail Address**:  dlanderson@sidley.com
*Attorney for American Chemistry Council*


I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on December 6, 2023, at Los Angeles, California.

| J. Cortez | Signature |
|-----------|-----------|
| Declarant | Signature |

SA2019104913